2003 WY 51

**Sean Robert ECKENROD, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 02–10.**

Supreme Court of Wyoming.

April 25, 2003.

Kenneth M. Koski, Wyoming State Public Defender; Donna D. Domonkos, Appellate Counsel; Tina N. Kerin, Senior Assistant Appellate Counsel, Representing Appellant. Argument by Ms. Kerin.

Hoke MacMillan, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Sean W. Scoggin and Julie Nye Tiedeken, Special Assistant Attorneys General, Representing Appellee. Argument by Ms. Tiedeken.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] During an investigation of illegal narcotics trafficking, Appellant Sean Eckenrod confessed to investigators the location of a large quantity of marijuana he intended to sell. His motion to suppress this evidence was denied, and he entered a conditional guilty plea that resulted in a 180–day jail sentence followed by an eight-year probation sentence. He appealed the denial to suppress, contending that he was arrested without probable cause during the investigation when an officer approached him with a drawn gun, he was escorted across the street and questioned after being read his *Miranda* rights, confessed involvement, and was then handcuffed and transported to the sheriff's office.

[¶ 2] We affirm.

### ISSUES

[¶ 3] Eckenrod presents this statement of the issues for our review:

I. Whether the trial court erred in denying the motion to suppress statements and evidence?

II. Whether the trial court erred in denying the motion to suppress search and

seizure, as the seizure of Appellant violated Appellant's constitutional rights?

The State rephrases the issues as:

I. Did the trial court correctly find that the detention of Appellant was proper and was not an unreasonable seizure in violation of his constitutional rights?

II. Did the trial court properly find Appellant's statements to be voluntarily made after he was properly given *Miranda* warnings?

## FACTS

[¶ 4] The Wyoming Division of Criminal Investigation (DCI) had received information that Eckenrod was involved with the distribution of twenty pounds of marijuana provided earlier in the year by Moises Banda Rascon. On March 17, 2001, Eckenrod was believed to have still possessed sixteen pounds and owed the original source $8,000.00. DCI had identified that source as a Hispanic male named Elon. The information indicated that, in a conversation with Cory Morrison, Eckenrod referred to a pound of marijuana as a "cookie."

[¶ 5] Working with DCI as an undercover agent, Gillete Police Department Officer Adam Edmondson went to Eckenrod's home at about 10:00 p.m. on March 17, 2001, on the pretense of collecting the $8,000.00 for Elon. The officer wore a tape-recorder which failed to capture the events that night. Two other agents, Peters and Wasson, were to observe from a distance and, if Officer Edmondson "had trouble" or "something had gone wrong," he was to remove his baseball cap.

[¶ 6] A party was underway at Eckenrod's home that night, and about twenty people were in and around the home. Officer Edmondson and Eckenrod met outside the home by the driveway under a streetlight, and Edmondson tried to convince Eckenrod that he had been sent by Elon. Eckenrod stated that he did not know what he was talking about and began to question the officer. Believing that Eckenrod knew Edmondson was a police officer, Edmondson raised his baseball cap. Agents Peters and Wasson ran up on foot to the pair. Agent Peters approached with his gun drawn, identified himself as a DCI agent, grabbed Eckenrod's arm, and patted him down for weapons. None were found, and he released Eckenrod and immediately "walked Eckenrod across the street and conducted an interview with him."

[¶ 7] Eckenrod was moved across the street and placed under another street light. Agent Peters testified he told Eckenrod that they knew he had been dealing with Moises Banda Rascon, had spoken with Cory Morrison about marijuana still in Eckenrod's possession, Eckenrod was expecting Elon to come and collect money, and the agents wanted to speak with Eckenrod about it. Agent Peters testified that he then advised Eckenrod of his *Miranda* rights, and Eckenrod agreed to talk with officers. Eckenrod told them that he knew what they were talking about, used the term "cookie," knew Moises Banda Rascon, and asked "[h]ypothetically what happens if I tell you where the marijuana is?"

[¶ 8] Eckenrod testified that he was questioned for about fifteen minutes before he was read his *Miranda* rights, and did not agree to talk with officers, but did ask some "hypothetical" questions. Eckenrod agreed that he then did admit his involvement because he thought he was under arrest and was assured his cooperation would help him. The agents testified that while they talked with Eckonrod on the street for about ten to fifteen minutes, the partygoers were milling about, yelling at the officers, and some had called them names. Eckenrod was then handcuffed and taken to the sheriff's office where the interview was continued. He consented to searches of his wallet, home, vehicles and a storage shed. The storage shed contained sixteen pounds of marijuana.

[¶ 9] Eckenrod agreed to cooperate with agents and was not formally arrested until May 8, 2001. Eckenrod filed a motion to suppress his statements and evidence on grounds that he had been arrested without probable cause. After an evidentiary hearing, the trial court determined that Eckenrod's initial encounter with the undercover officer, Edmondson, was a consensual encounter that did not involve the Fourth

Amendment. The trial court then ruled in relevant part:

When [Officer Edmondson] took off his ball cap and Agent Peters came up to the Defendant with his gun drawn, this changed the encounter to a detention. The initial detention represents a seizure of the person which does implicate the Fourth Amendment requiring the presence of specific, articulable facts and rational inferences giving rise to a reasonable suspicion that a person has committed or maybe committed a crime. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). It is clear that the Defendant, at this point, was seized; "In view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S. v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). The Defendant was moved across the street and even the agent knew that this was a "custodial" detention as he immediately read to the Defendant his Miranda rights. The Defendant agreed that he understood his rights and agreed to talk with the officers. In looking at the reasonableness of this investigatory detention, it appears that the officers' actions were justified at the inception and were related in scope to the circumstances which justified the interference in the first place. *Putnam v. State,* 995 P.2d 632, 637 (Wyo.2000).

[¶ 10] The motion to suppress was denied, and Eckenrod entered a conditional guilty plea to two counts and received a 180–day jail sentence followed by an eight-year probation term. This appeal followed.

## DISCUSSION

*Standard of Review*

[¶ 11] Generally, we do not disturb a trial court's evidentiary rulings unless the court has clearly abused its discretion. *Wilson v. State,* 874 P.2d 215, 218 (Wyo. 1994). "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and

without doing so arbitrarily or capriciously." *Vaughn v. State,* 962 P.2d 149, 151 (Wyo. 1998). We give deference to the trial court's findings of fact on a motion to suppress unless they are clearly erroneous, recognizing that court has had the opportunity to assess the credibility of witnesses, weigh the evidence and make the necessary inferences, deductions and conclusions. *Jones v. State,* 902 P.2d 686, 690 (Wyo.1995) (citing *Wilson,* 874 P.2d at 218). Whether an unreasonable search or seizure occurred in violation of constitutional rights presents a question of law that we review de novo. *Wilson,* at 218.

[¶ 12] Warrantless searches and seizures are per se unreasonable under both the Fourth Amendment of the United States Constitution and Article 1, Section 4, of the Wyoming Constitution; however, an arrest without a warrant is reasonable if there is probable cause to believe that a crime was committed and it was committed by the suspect. *Ostrowski v. State,* 665 P.2d 471, 476 (Wyo.1983) (citing *Michigan v. DeFillippo,* 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979)); *see also Dickeson v. State,* 843 P.2d 606, 611 (Wyo.1992). A person has been seized within the meaning of the Fourth Amendment if, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Wilson,* 874 P.2d at 220 (quoting *United States v. Mendenhall,* 446 U.S. 544, 554–55, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)). This test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *McChesney v. State,* 988 P.2d 1071, 1074–75 (Wyo.1999) (quoting *California v. Hodari D.,* 499 U.S. 621, 628, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991)).

[¶ 13] In evaluating whether police-citizen encounters are constitutionally valid, we have identified three categories or tiers of interaction between police and citizen:

[1] The most intrusive encounter, an arrest, requires justification by probable cause to believe that a person has committed or is committing a crime. [2] The investigatory stop represents a seizure

which invokes Fourth Amendment safeguards, but, by its less intrusive character, requires only the presence of specific and articulable facts and rational inferences which give rise to a reasonable suspicion that a person has committed or may be committing a crime. [3] The least intrusive police-citizen contact, a consensual encounter, involves no restraint of liberty and elicits the citizen's voluntary cooperation with non-coercive questioning.

*Wilson,* 874 P.2d at 220 (citations omitted).

### Validity of Detention

[¶ 14]   Although Eckenrod does not agree that the initial encounter between himself and Officer Edmundson was consensual, he raises no issue concerning it on grounds that it should be considered an arrest requiring probable cause, or that it was an investigative detention unsupported by reasonable suspicion, and we agree that the officer's initial contact with Eckenrod by appearing at the door of his home in an undercover capacity is not at issue. We, thus, focus on the intrusiveness of the agents' actions at three other discrete times where it appears the nature of the encounter changed. First, we examine the nature of the encounter when Agent Peters approached Eckenrod with a drawn gun, grabbed him, and conducted a weapons search; second, we consider the circumstances present that caused the agents to move Eckenrod across the street and advise him of his *Miranda* rights; and, lastly, we consider the nature of the encounter that resulted when Eckenrod was handcuffed and transported to the sheriff's office.

[¶ 15]   The district court ruled, and the State agrees, that the nature of the encounter remained a valid seizure under *Terry* after Agent Peters arrived on the scene with a drawn weapon. We disagree with the assessment that the entirety of the encounter was a *Terry* seizure for the purpose of investigating Eckenrod's criminal involvement in a drug conspiracy. We nevertheless believe that, as the nature of the encounter changed, the totality of the circumstances indicate that Eckenrod was not arrested without probable cause.

[¶ 16]   Agent Peters testified that, in response to seeing Edmondson signal that he was in trouble and something had gone wrong, Agent Peters approached Eckenrod with a drawn gun, grabbed him, and conducted a weapons search. These facts require that we examine whether the agent's use of force for safety reasons transformed the encounter into an arrest requiring probable cause. We have previously considered the use of intrusive measures in making *Terry* stops and held that police officers may draw their weapons without transforming an otherwise valid *Terry* stop into an arrest. *Brown v. State,* 944 P.2d 1168 (Wyo.1997). *Brown* agreed with the following statement:

> While *Terry* stops generally must be fairly nonintrusive, officers may take necessary steps to protect themselves if the circumstances reasonably warrant such measures. "[T]he use of guns in connection with a stop is permissible where the police reasonably believe [the weapons] are necessary for their protection." *United States v. Merritt,* 695 F.2d 1263, 1273 (10th Cir. 1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).
> * * * *
> This holding is consistent with the recent trend allowing police to use handcuffs or place suspects on the ground during a *Terry* stop. Nine courts of appeals, including the Tenth Circuit, have determined that such intrusive precautionary measures do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment.

*Id.* at 1172 (quoting *United States v. Perdue,* 8 F.3d 1455, 1462–63 (10th Cir.1993)).

[¶ 17]   We examine whether the seizure by Agent Peters was justified at the inception, and whether articulable facts existed to demonstrate that Agent Peters had a reasonable suspicion to justify the intrusive measures used to ensure his and the other agents' safety. *Brown,* 944 P.2d at 1171. We recently summarized our review:

> [W]e have a dual inquiry for evaluating the reasonableness of an investigatory stop: (1) whether the officer's actions were justified at the inception; and (2) whether it was reasonably related in scope to the

circumstances that justified the interference in the first instance. An officer's conduct is judged by an objective standard which takes into account the totality of the circumstances. In applying this test, the Court has consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry. The government has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Damato v. State,* 2003 WY 13, ¶ 9, 64 P.3d 700, ¶ 9 (Wyo.2003) (citations and quotation marks omitted).

[¶ 18] Based on seeing the prearranged signal of trouble or that something had gone wrong, Agent Peters had an objectively reasonable basis to suspect that Eckenrod was threatening the safety of Officer Edmundson who had represented himself as a member of the drug conspiracy. Although Edmundson gave the signal for reasons other than to indicate that his safety was jeopardized, Agent Peters acted appropriately in light of the information he possessed. The facts show that Agent Peters feared for Officer Edmundson's safety, and this fact justified the display of some force and was not unreasonable under the circumstances.

[¶ 19] The district court concluded that a custodial seizure occurred when the agents moved Eckenrod across the street and advised him of his *Miranda* rights. The district court determined the seizure to be an investigative detention supported by reasonable suspicion; presumably, the reasonable suspicion was the information that Eckenrod was involved in a marijuana trafficking conspiracy. Eckenrod contends that having been approached by an agent with a drawn weapon, grabbed, searched, moved across the street, and then advised of his *Miranda* rights, he justifiably assumed that he was under arrest and not free to leave. He contends that the district court erred in failing to conclude that he had been arrested without probable cause.

[¶ 20] Because the district court concluded that the agents moved Eckenrod across the street, we must examine whether this forcible move was an arrest. The record shows that Eckenrod was moved after Agent Peters learned that Eckenrod was not carrying a weapon and safety concerns were no longer an issue to any of the agents because all three law enforcement agents had encircled an unarmed Eckenrod. However, the record shows that another safety issue factor had arisen which justified this intrusive measure as a reasonably necessary precaution and did not change the lawful *Terry* stop into an unlawful arrest without probable cause. Agent Peters testified that he believed that it was his idea to move across the street, because persons attending the party had begun to yell insults at the three agents and were calling them names like "pig," etc. Both agents testified that it seemed appropriate to move away from the hostile crowd and place some distance between the men and the crowd. Courts generally accept that, although rare, factual situations do occur that permit a "transport" detention without transforming a *Terry* stop into an arrest requiring probable cause. *People v. Harris,* 15 Cal.3d 384, 124 Cal. Rptr. 536, 540 P.2d 632, 636 (1975); 4 Wayne R. LaFave, *Search and Seizure* § 9.2(g) at 84 (3d ed.1996). *Harris* stated that when an investigating officer is confronted by a hostile crowd, the Fourth Amendment does not mandate that an investigating officer choose between continuing the investigation at the risk of personal safety or abandoning his investigation. *Harris,* 124 Cal.Rptr. 536, 540 P.2d at 636. We agree that the agents' precautionary measure here was justified. We also find that the trial court properly concluded that the officers' advising Eckenrod of his *Miranda* rights indicated that he was a criminal suspect being subjected to custodial interrogation; however, being placed in police "custody" for purposes of *Miranda* can occur before a suspect has been arrested. *Perdue,* 8 F.3d at 1464. We hold the trial court properly concluded that this part of the encounter was a valid *Terry* stop.

[¶ 21] Finally, the district court did not make findings or conclusions about

the agents' handcuffing and transporting Eckenrod to the sheriff's office for further interrogation. The State contends that this was part of the investigative detention; however, handcuffing and transporting a suspect is an arrest if no circumstances otherwise justify the removal. *Harris*, 124 Cal. Rptr. 536, 540 P.2d at 635–36. After receiving advice of his *Miranda* rights, Eckenrod agreed to speak with the agents and confirmed the information the agents had concerning his involvement in the drug conspiracy. The question is whether Eckenrod was arrested with probable cause when he was handcuffed and transported to the sheriff's office. In deciding whether probable cause is sufficient to justify a warrantless arrest, it must be determined that "the facts and circumstances within the peace officer's knowledge and of which he had reasonably trustworthy information were sufficient to warrant a reasonably cautious or prudent man to believe that the person arrested has committed * * * an offense." *Ostrowski*, 665 P.2d at 476.

[¶ 22] Here, the agents were investigating Eckenrod's involvement in a drug conspiracy based upon information from a recorded telephone conversation and a confidential informant. The agents had probable cause to arrest Eckenrod when he confirmed the agents' information and indicated that he would show them where the marijuana was being stored, and we find no constitutional violation occurred by the agents' handcuffing him and transporting him to the sheriff's office.

[¶ 23] Having examined the nature of the encounter at each point where it changed, we conclude that Eckenrod's seizure was a constitutionally valid investigative detention until his statements provided probable cause for his warrantless arrest. We affirm the district court's order denying the motion to suppress on grounds that he had been unlawfully arrested.

[¶ 24] Eckenrod contends that this Court has indicated that the Wyoming Constitution may provide greater protection when the question is one of a person's seizure, and because the record does not show that at the suppression hearing any actual, articulable reasons were given for his detention, his convictions should be reversed. The record does not support this assertion, and as Eckenrod does not make any other argument, we decline to consider the lawfulness of his detention and arrest under the state constitution.

*Voluntariness*

[¶ 25] Eckenrod contends that although he was provided with his *Miranda* rights, the agents' aggressiveness created a coercive atmosphere that frightened him and further induced his confession by promising to help him if he cooperated. He claims that these circumstances render his statements involuntary. Our standard of review for involuntariness claims states that:

[t]o comply with *Miranda*, law enforcement must advise an accused of his rights before any of the accused's statements, made during custodial interrogation, can be used against the accused at trial. Failure to comply with these procedural safeguards requires the court to suppress such statements. We review the record to determine whether the trial court could conclude, given the totality of the circumstances, that the police sufficiently followed *Miranda*.

Moreover, even when *Miranda* has been complied with, the United States Constitution, amendments V and XIV, as well as the Wyoming Constitution, art. 1, §§ 6 and 11, require admissions and statements to be voluntary. To be voluntary, the defendant's statements must result from "free and deliberate choice rather than intimidation, coercion, or deception." Because we presume a defendant's statements to be involuntary, the burden rests on the State to show, by a preponderance of the evidence, that the defendant's statements were voluntary. Once the State has met its burden and rebutted the presumption of involuntariness, the defendant may be required to present evidence demonstrating the involuntariness of his statements. If such statements resulted from coercion, then the statements are inadmissible at trial for any purpose because their validity is suspect.

Voluntariness is a legal question; thus, we review the ultimate issue, whether a defendant's statements were voluntary, de novo. On review, however, we will not disturb the trial court's findings of fact unless clearly erroneous. We look to the totality of the circumstances to determine if the defendant's statements were voluntary.

*Mitchell v. State*, 982 P.2d 717, 720–21 (Wyo. 1999) (citations omitted).

[¶ 26] In considering the totality of the circumstances, we consider:

[T]he atmosphere and events surrounding the elicitation of the statement, such as the use of violence, threats, promises, improper influence or official misconduct, the conduct of the defendant before and during the interrogation and the defendant's mental condition at the time the statement is made.

\* \* \*, \*

[A] confession offends due process if the suspect's will was overborne by the police and the suspect's capacity for self-determination was seriously impaired.

*State v. Evans*, 944 P.2d 1120, 1125 (Wyo. 1997). The district court concluded that Eckenrod was immediately read his *Miranda* rights and agreed that he understood his rights and agreed to talk with the officers. In reviewing the record, we believe that the district court properly characterized Eckenrod's actions as agreement. Although he disputed that he voluntarily made statements, the record indicates that Eckenrod agreed that the agents explained the information they had concerning his involvement, had been advised of his right to remain silent, and Eckenrod asked hypothetical questions concerning whether it would help if he cooperated with the officers, apparently being not so scared as to prevent him from exploring his options. Eckenrod does not claim that he did not understand his rights or the significance of confessing or did not have the mental capacity to understand his right to remain silent. The agents testified that Eckenrod was told that his cooperation would be reported to the prosecution and this did occur. We have previously rejected that this "report-of-cooperation" statement is improper inducement that shows one's will was overborne. *Vena v. State*, 941 P.2d 33, 37–38 (Wyo.1997). We hold that Eckenrod's statements were voluntary. We affirm the order denying the motion to suppress.